**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JADED MAHELET RUVALCA MARTINEZ, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 15 C 11411 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| PETER VALDEZ CAHUE, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Jaded Mahelet Ruvalca Martinez petitions for the return of her minor son, nine-year-old "A.M." to Mexico, which she alleges was the place of the child's habitual residence at the time his father wrongfully retained the child in the United States after an agreed visit in August 2014. She brings the petition under the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (Oct. 25, 1980) enacted into federal law through the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001 *et seq*. Under the Convention, a parent whose child has been wrongfully removed to or retained in the United States may petition for the child's return to his or her country of habitual residence, where the local courts can "resolve any questions about custody, support, or other family law matters." *Garcia v. Pinelo*, 808 F.3d 1158, 1159 (7th Cir. 2015).

This Court previously entered a temporary restraining order requiring the father, respondent Peter Valdez Cahue, to remain with A.M. in the Northern District of Illinois and to surrender their passports. The TRO was extended with the parties' consent pending a decision on the petition. As required by the Convention, the Court held expedited proceedings, including an evidentiary hearing on March 3, 2016. With the parties' agreement, the court appointed a

guardian ad litem for the minor child. The GAL submitted a report to the Court and testified briefly at the hearing. The other witnesses who testified were Ms. Martinez, her mother Natalie Martinez, and Mr. Cahue. After the hearing, the parties submitted closing briefs and response briefs. The Court announced its ruling and outlined its basic rationale in open court on March 11, 2016; the Court denied the petition for return to Mexico, terminated the TRO, and entered judgment for the respondent. This opinion further explains the Court's findings and reasoning.

## Background

There is no material dispute over the relevant facts before 2013. Ms. Martinez and Mr. Cahue were a couple for many years, beginning when they were teenagers. A.M. was born in March 2006 in Oak Lawn, Illinois. Paternity is not disputed, and after A.M.'s birth, Cahue signed a voluntary acknowledgement of paternity. For his entire life until age 7, A.M. always lived with his mother in the Chicago area, where his father also lived, as did his maternal and paternal grandparents. A.M. went to school and church in the area and played for several soccer teams. For some periods of time Ms. Martinez, Mr. Cahue, and A.M. resided together. The relationship between Martinez and Cahue was described by them both as "on and off" over the years, until ultimately it became "off" for good. Ms. Martinez says that she ended her relationship with Mr. Cahue sometime in 2012, whereas Mr. Cahue said that the couple continued to see each other until July 2013, when Martinez left the United States.

On February 24, 2010, the parents signed a notarized custody agreement.[1] In the short, handwritten document, Cahue agreed that he would not "fight custody in court for my son" and

---

[1] According to Martinez's testimony, she requested this custody agreement in exchange for dropping charges against Mr. Cahue for a domestic battery in 2009. The circumstances of that event are not otherwise relevant to this proceeding, which is not meant to adjudicate custody or the child's best interests, and where the Convention's affirmative defense of "grave risk of harm," Article 13(b), is not at issue where Cahue is the respondent. The Court notes that it has

Martinez agreed that Cahue would have "constant access" to A.M. including overnight visits "2 days a week." Whether these precise terms were followed or not, there is no dispute that Cahue continued to have frequent contact and visits with A.M., who lived continuously with Martinez and her parents from the time of this 2010 agreement until July 2013.

In the Spring of 2013, Ms. Martinez—then employed at the Mexican consulate in Chicago was presented with an opportunity to open a restaurant in Mexico with a cousin. Ms. Martinez decided to pursue the opportunity and move with A.M. to Mexico. She informed her employer that she would be leaving, and over the next few months she made the arrangements to move with A.M. She sold her car to her uncle and began to research schools in Mexico for A.M. She purchased one-way tickets to fly to Mexico with A.M., and arranged for a cousin to drive her belongings to Mexico in his truck. About two weeks before her departure, her co-workers threw her a going-away party.

Ms. Martinez testified that she told Mr. Cahue that she was relocating with A.M. to Mexico months in advance of the move, in May 2013, and he did not object. Ms. Martinez testified that Mr. Cahue knew there was nothing he could do about her move because of their private custody agreement, but that nevertheless he was "okay with it" and never expressed "displeasure" with her decision. Her mother, Natalie Martinez, provided some corroboration for Martinez's claim by testifying that she recalled being present at her home with one of her nephews, Ms. Martinez, and Mr. Cahue when the move was discussed, possibly for the first time.

_____

been recognized that the Convention's remedy of return has been deemed "problematic" when the alleged abductor is the custodial parent and where the flight is to escape alleged abuse. *Van De Sande v. Van De Sande*, 431 F.3d 567, 569 (7th Cir. 2005). But this is not the situation described in *Van De Sande*, because Ms. Martinez, who has been in effect the custodial parent, is the petitioner here, not the "abductor." Moreover, despite her testimony accusing Cahue of physical, psychological, and emotional abuse, Ms. Martinez does not contend that she fled with A.M. to escape Cahue. She has consistently maintained that she left the United States with Cahue's blessing to pursue a business opportunity and establish a new life in Mexico.

According to Natalie, Mr. Cahue did not voice any reservations about the permanent, or indefinite, move. Natalie did not remember when the conversation took place or how it came to be that Cahue, an infrequent visitor to her home, was there. The petitioner did not submit any documents or records that further corroborate her testimony that she informed Cahue, such as any text messages or other communications with Mr. Cahue,. Ms. Martinez did not request A.M.'s school records before she left the United States.

Mr. Cahue testified that he had no idea that Ms. Martinez was planning to move to Mexico. He said that he was told she was taking him to Mexico in July 2013 for a reunion of her extended family and a beach vacation, something to which he did not object. On July 25, 2013, he signed a notarized letter authorizing the travel the next day, when Ms. Martinez had booked a one-way plane ticket for herself and A.M. Ms. Martinez testified that this was part of the couple's "process" whenever A.M. traveled. Cahue testified that he pressed Ms. Martinez to include a return date, but she said it was uncertain, and there was a possibility she and A.M. would be returning by car with some of her family members. Cahue testified that he finally relented and signed the travel authorization because Martinez made a public scene outside the notary's office, with A.M. present. Martinez, by contrast, testified that Cahue did not express any concern whatsoever about the absence of a return date on the travel authorization.

Ms. Martinez sent many of A.M.'s and possessions from her parents' home—"90%"—to Mexico in her cousin's truck, leaving behind, she said, only "knick-knacks." Cahue helped pack A.M. for, he says, a trip to the beach, not a permanent move. Cahue testified that he brought Martinez four or five outfits from Cahue's home; however, Cahue testified, A.M. did not take other belongings, such as his toys, from his father's home. Cahue was aware that A.M. was bringing his soccer shoes with him to Mexico, but this was not surprising since he expected that

A.M. would play soccer while in Mexico. He also purchased A.M. a snorkel and inflatable water wings for use at the beach. When dropping these items off with Martinez, Cahue saw only a small suitcase for A.M.'s things.

The parties' versions of events diverge even further from here. According to Ms. Martinez, she proceeded as she planned upon arriving in Mexico. She enrolled A.M. in a top private school, which required her to send for A.M's school records from Illinois. A.M. adjusted quickly to his new environment, performing well in school,[2] playing soccer on several elite teams, and even earning a scholarship based on his soccer skills and grades. A.M. had playmates at school and on his soccer teams; he attended church regularly; and he spent time with his large extended family in Mexico. After initially living with her godmother, Martinez and A.M. moved to a rental home in an upscale gated community in March 2014.

According to Mr. Cahue, however, he was blindsided by Martinez's failure to return to Illinois. After Martinez and A.M. had been gone for about two weeks, he began calling her and asking when they were coming back. When she told him that she might be driving back with her uncle, Cahue testified, he sent her $300 to cover the gas for the drive back, and there is a record of a $300 transfer from Cahue to Martinez on August 7, 2013. Martinez never arrived in Illinois, however, and soon she began ignoring Cahue's communications entirely. Cahue testified that he became worried and called Martinez's mother, who was crying and said that she did not know what was happening, and also called her sister who also said that Martinez had not told her she was going to move to Mexico. Cahue called Martinez's grandfather in Mexico as well, who similarly provided no helpful information. Cahue testified that he also went to the home of Martinez's parents, where her father told him to leave the matter alone because Martinez was

_____

[2] A.M. earned a grade point average of 8.9 out of 10 and was promoted to third grade.

A.M.'s mother and would have custody of him. Mr. Cahue testified that he also contacted the police in Oak Lawn, but was told there was nothing that they could do. In September, Cahue testified, he consulted with a lawyer, who informed him of his rights under the Hague Convention and began to prepare the documents for Cahue. When the attorney learned that Jaded Martinez was the mother, however, he told Cahue that he could not represent him because he believed he had a conflict of interest; he did work with the Mexican consulate and was personally acquainted with Martinez.

Martinez, meanwhile, had initiated a legal action in Mexico against Cahue; she requested child support and an order of protection in a petition filed on October 16, 2013. In support of her request, Martinez averred that Cahue had threatened by telephone to come and take the child. Although the petition was never served on Cahue, Martinez testified that she told him about it, and that he was very angry. But, she testified, they soon agreed to a plan whereby Cahue would have visitation with A.M. in the United States. So she "dropped" her petition[3] and did not seek a protective order or any child support from Cahue. The parties discussed visits for Cahue and A.M. in December 2013, April 2014, and July 2014, corresponding to A.M.'s school breaks. The December 2013 visit did not take place (although apparently Cahue traveled elsewhere in Mexico), but arrangements were made for A.M. to visit Cahue in Illinois for his spring break,

At some point in December 2013, Cahue communicated in writing with the Department of State regarding his rights under the Hague Convention. (Cahue testified that he had initiated contact by phone as early as September or October 2013.) In a December 17, 2013 letter, Country Officer Rosemarie Skelly Mendoza confirmed an earlier telephone call with Cahue and explained the rights of parents under Hague Convention in the event of an international

---

[3] Martinez also testified that she stopped pursuing the petition because it would take too long and because the requirements for service were onerous.

abduction. In an email the same day, Mendoza transmitted a blank application for relief under the Hague Convention.

Cahue did not, however, file a petition under the Hague Convention for A.M.'s return. But he remained in occasional contact with the State Department. And when A.M. visited Cahue in Illinois with Martinez's authorization from April 26, 2014 to May 4, 2014, Cahue returned him to Mexico as promised, despite reservations. Cahue testified that he contemplated keeping A.M. with him at this point but decided to send A.M. back to Mexico because Martinez had agreed to send A.M. to Chicago in the summer and he did not want to disrupt A.M.'s school year. Days later though, on May 6, Mendoza from the State Department advised him in an email that if he was uncertain whether A.M.'s mother would allow A.M. to return to the United States again, Cahue "should really think about letting [A.M.] travel back to Mexico."[4]

Come July 2014, Martinez sent A.M. to Chicago for what she intended to be another short visit. She testified, and there is no dispute, that she did not agree to send A.M. to the United States to remain indefinitely with Mr. Cahue. She wanted A.M. back in time to start school on August 18. Initially Cahue purchased a one-way ticket for A.M. to travel from Mexico to Chicago on July 3. Martinez then told Cahue that she would not allow A.M. to travel without proof of a return flight, so on July 2, Mr. Cahue purchased a return airline ticket for A.M. for August 16. As planned, A.M. traveled to Illinois on July 3.

Nor is there any dispute that Mr. Cahue intended to keep A.M. in Chicago rather than returning him to Ms. Martinez in Mexico. He readily acknowledges that he bought the return flight only to convince Ms. Martinez to send A.M. on the trip. On August 16, 2014, Ms.

---

[4] In this same email, which noted that she and Cahue kept "missing each other over the phone," Mendoza stated that she was glad to hear the Cahue was "working out a visitation plan" with Martinez.

Martinez traveled a substantial distance to meet A.M.'s flight back to Mexico, but A.M. was not on it. She immediately began contacting Mr. Cahue, who told her he had forgotten about the flight. Cahue then stopped answering Martinez's calls. On August 21, Cahue contacted the State Department again to ask about preventing A.M.'s mother from trying to take A.M. back to Mexico; he specifically asked about his options for putting A.M.'s passport "on hold" to prevent him from leaving the United States. He was advised about the passport and told to ask the State Department's Prevention Unit about what kind of court order was necessary to prevent A.M. from leaving the country.

After unsuccessfully prevailing upon Cahue to send A.M. back to Mexico, Martinez traveled to Illinois on August 25, 2014, to retrieve A.M. She surprised Cahue at his home on August 25, and he allowed A.M. to go with Martinez overnight. Cahue went straight to the police to prevent Martinez from leaving the country with A.M.; when he was told that there was nothing they could do, Cahue then pursued remedies in state court.

On August 27, 2014, Cahue, through counsel, filed a petition for custody of A.M. in Illinois court. He also filed an emergency motion for immediate possession of A.M. and for preliminary and permanent injunctions preventing Martinez from removing A.M. from Illinois. The emergency motion was granted. Armed with the order of immediate possession, Cahue had the police go to Martinez's parents' home and order her to turn over A.M. Martinez testified to being traumatized by the appearance of the police officers and the forced separation from her son. Martinez remained in the United States through September 17, 2014, when a further court hearing was scheduled in connection with Cahue's emergency motion. Martinez obtained counsel, who answered the petition for custody and attended the September 17 hearing, at which Martinez testified. No objection to the court's jurisdiction was made. The Illinois court continued

the temporary possession order in favor of Cahue and ordered the surrender of A.M.'s U.S. and Mexican passports.

After the hearing, Martinez returned to Mexico to pursue her legal remedies there. In October 2014, she reopened the case that she previously had filed against Cahue and also began to pursue relief under the Hague Convention. On February 6, 2015, she filed a completed application under the Hague Convention with the Mexican Central Authority. That petition was transmitted to the State Department—the American central authority for purposes of the Hague Convention—on March 13, 2015. In addition, Martinez testified that on the same day, she faxed a letter to the Illinois judge presiding over the custody case informing her of the pending Hague Petition and contesting the Illinois court's jurisdiction to adjudicate custody. That letter, which was attached to the petition, is in evidence (although there is no proof of transmission or receipt), as is a March 17, 2015, State Department letter to the Illinois judge, advising her of the pendency of the Hague Convention proceedings. The State Department's letter explained that under Article 16 of the Convention, no decision "on the merits of rights of custody" can be made "until it has been determined that the child is not to be returned under this Convention." There is, however, no evidence in the record confirming receipt of either of these communications by the state judge, who, on March 18, 2015, entered a default judgment in favor of Mr. Cahue, granting the motion that his attorneys had filed on March 11. The order awards sole legal and physical custody to Cahue "in the best interests of the minor child." Martinez did not move to reconsider this order based on her Hague petition, nor did she appeal the judgment.

From September 2014 to the present, Martinez has continued to live in Mexico, and is now attending law school there, while attempting to maintain regular contact with A.M. (though she claims that Cahue often frustrates her ability to do so). She visited A.M. in the United States

in June and November of 2015 and again during the course of proceedings in this case. She obtained counsel to represent her in the administrative proceedings on her Hague petition. Upon learning that Cahue had obtained a new U.S. passport for A.M. on December 15, 2015, she also initiated the emergency proceedings in this Court and filed her Verified Petition for Return of Minor Child to Mexico.

## Discussion

The task before this Court is not to decide any issue of custody or to determine the child's best interests. Issues of parental rights and custody are to be adjudicated only after the child is present in the proper jurisdiction.[5] This Court is tasked solely with determining which country's courts should decide these weighty issues.

### A.       Legal Framework

"'[E]very Hague Convention petition turns on the threshold determination of the child's habitual residence; all other Hague determinations flow from that decision." *Redmond v. Redmond,* 724 F.3d 729, 742 (7th Cir. 2013)." More specifically, "a Hague Convention case asks the following questions in this order: (1) When did the removal or retention of the child occur? (2) In what State was the child habitually resident immediately prior to the removal or retention? (3) Was the removal or retention in breach of the custody rights of the petitioning parent under the law of the State of the child's habitual residence? and (4) Was the petitioning parent exercising those rights at the time of the unlawful removal or retention?" *Id. at* 737-38.

---

[5] Accordingly, the custody proceedings filed by Cahue in Cook County, and the petition initiated by Martinez in Mexico, have no bearing on the issue before the Court. That is true even though the Circuit Court of Cook County purported to enter a judgment in favor of Cahue. The Hague Convention trumps the local courts' custody determinations until the habitual residence is determined.

In this case, the allegedly unlawful retention occurred on August 16, 2014,[6] or shortly thereafter, when it became clear to Martinez that Cahue did not intend to send the child back to Mexico to live with her there. This case therefore turns on whether A.M. was still a habitual resident of Illinois in August 2014, despite having lived in Mexico for the preceding year, or whether his habitual residence changed to Mexico when he traveled there with his mother in July 2013 and remained there for the next year (except for the April 2014 spring break trip to Illinois).

The Hague Convention does not define "habitual residence." Instead, the judicial and administrative bodies of the signatory nations are to interpret the term according to its ordinary and natural meaning, and without reference to any idiosyncratic legal definitions in the forum. *Koch v. Koch*, 450 F.3d 703, 712 (7th Cir. 2006); *Redmond*, 724 F.3d at 742-43. Accordingly, "habitual residence" is not synonymous with the American concept of "domicile." *Kijowska v. Haines*, 463 F.3d 583, 587 (7th Cir. 2006).

In *Koch*, the Seventh Circuit loosely adopted the approach of the Ninth Circuit in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), which examines whether there is a shared parental intent, evidenced by actions as well as declarations, to abandon one habitual residence and set up another. *See Koch*, 450 F.3d at 715. As applied in a wrongful-retention case, this approach requires the court to "determine a child's habitual residence by asking whether a prior place of residence was effectively abandoned and a new residence established by the shared actions and intent of the parents coupled with the passage of time." *Walker v. Walker*, 701 F.3d 1110, 1119 (7th Cir. 2012); *see Koch*, 405 F.3d at 715.

---

[6] It is the respondent's position, of course, that the petitioner's retention of A.M. in Mexico beyond August 2013 was wrongful, because Cahue had consented only to a short vacation. But that is not the subject of this petition, which is directed solely at Cahue's retention of A.M. after August 16, 2014. Cahue never challenged the July 2013 removal to Mexico under the Hague Convention.

In *Redmond*, however, the Seventh Circuit clarified that there is no "fixed doctrinal test" or "uniformly applicable 'test'" that focuses on shared parental intent, or indeed, any single factor. *Redmond*, 724 F.3d at 744, 746. The parents' last shared intent "is one fact among others and indeed may be a very important fact in some cases." *Id*. at 744. But other factors, such as the child's acclimitization to a new location, may also be as, or more, relevant in a particular case. As set forth in *Redmond*, no single factor is necessarily dispositive of the habitual residence inquiry; the determination of habitual residence is "a practical, flexible, factual inquiry that accounts for all available relevant evidence and considers the individual circumstances of each case." *Redmond*, 724 F.3d at 732; *id*. at 744 (the inquiry "remains a flexible one, sensitive to the unique circumstances of the case and informed by common sense"). The court framed the ultimate question as whether ordering return to a particular country was tantamount to sending him "home." *Id*. at 747 (citing *Holder v. Holder*, 392 F.3d 1009, 1019 (9th Cir. 2004)).

One factor that should ***not*** enter the inquiry of habitual residence (even though possibly relevant to the "wrongfulness" inquiry) is the parents' custody rights; otherwise, the Convention would turn into a custody-rights enforcement mechanism, which it is not. *Redmond,* 724 F.3d at 743.[7] Another factor that should be ignored is the length of the child's residence in the country of one of the parents; if this factor were decisive, it would invite abduction. *Kijowska*, 463 F.3d at 587. *See also Garcia v. Pinelo*, 808 F.3d 1158 (2015) (a parent cannot escape the Convention by "running out the clock" until a child becomes accustomed to her new home).

In summary, then, the habitual residence must be determined with reference to all relevant factors, including both shared parental intent and acclimitization, and the factors must

---

[7] For this reason, the petitioner's argument that Cahue's "consent" to her relocation of A.M. to Mexico is irrelevant in light of her Illinois custody rights is misplaced.

be weighed according to the individualized circumstances of the case. The Court is to make a common-sense determination of where the child is at home.

### B.    The Parties' Arguments

The petitioner, Martinez, contends that the retention of A.M. in the United States in August 2014 was wrongful because A.M. was a habitual resident of Mexico, where Martinez was exercising her lawful custody rights over him. Martinez argues that Cahue consented to her intent to relocate with A.M., or at the very least, ratified that decision when he agreed to a visitation schedule and otherwise failed to take action to procure the boy's return. A,M. became acclimatized to Mexico, which became his home, she argues. Alternatively, Martinez now contends that Cahue's consent is irrelevant to the determination of A.M.'s habitual residence because she enjoyed sole custody pursuant to their February 2010 agreement and by default as an unmarried custodial parent under Illinois law. Because of this, she argues, Cahue had no say in establishing A.M.'s place of habitual residence.

Cahue, on the other hand, argues that Mexico never became the habitual residence of A.M., primarily because there is no evidence of a shared parental intent to establish his residence there, abandoning the lifelong habitual residence of Illinois. He further argues that even if his retention of A.M. in August 2014 was wrongful, return to Mexico should not be ordered because he has established two affirmative defenses under the Convention: that A.M. is now well-settled back in Illinois and, alternatively, that Ms. Martinez acquiesced in the retention by failing to defend the Illinois custody action.

### C.    Findings

The premise of Martinez's petition is that Cahue's retention of A.M. in August 2014 was wrongful, which requires her to prove that Mexico was the child's place of habitual residence at

that time. It is beyond dispute that Illinois was A.M.'s habitual residence from the time of his birth in Oak Lawn and remained so at least until July 2013 when Martinez took him to Mexico. As the petitioner, Martinez therefore bears the burden of proving, by a preponderance of the evidence, that the year A.M. spent in Mexico constituted an abandonment of Illinois in favor of a new indefinite home, by virtue of the mutual intent of the parents, his acclimatization, or any other relevant factors. The Court concludes that, although a close call, petitioner has not met her burden of proof. Notwithstanding A.M.'s acclimatization to Mexico during his year there, there is insufficient evidence in the record to support the conclusion that Illinois ceased being the child's home.

Starting first with the issue of shared intent, the question of whether the parties shared an intent that A.M. would remain in Mexico has been hotly contested. Notwithstanding that the focus of the parties' presentations has been on this question, the answer turns largely on an assessment of the credibility of the parents. Stated simply, one parent testified untruthfully about whether Cahue knew about and consented to Martinez's move to Mexico with A.M. Having examined the full record and observed the witnesses during their testimony, the Court concludes that Martinez has failed to establish by a preponderance of the evidence that Cahue agreed to, or ratified after-the-fact, her move with A.M. to Mexico. The Court therefore finds that the move to Mexico in 2013 was a unilateral decision of Martinez and took place without the prior knowledge or consent of Cahue.

The only evidence that Cahue agreed to allow A.M. to relocate with his mother to Mexico is the testimony of Martinez and her mother, which the Court does not find to be credible on this point. Despite the significance of the moment for herself, Cahue, and A.M., Ms. Martinez could not recall any specific conversation with Mr. Cahue when she first informed him of this

major life change or any subsequent conversation in which she shared any details of the plan, other than requesting a travel authorization for the flight on July 26 one day before she was to leave. This couple had a long-standing and sometimes stormy relationship; Cahue had been an active part of A.M.'s life as he grew up, and had back in 2010 agreed not to fight for custody of A.M. "in court" only on the condition that he be permitted "constant access" to the child. Given these circumstances, if Martinez was going to tell Cahue that she was making a permanent move to Mexico and was taking A.M. with her, she would have anticipated resistance to that decision and, had the conversation occurred, one would expect that she would well remember the details. She professes not to, however, and her mother's corroborative testimony was similarly lacking detail and color; Natalie Martinez offered only vague testimony that the subject of relocating to Mexico was discussed in Cahue's presence on one occasion and could not recall any details of the conversation other than Cahue's purported lack of objection.

Martinez places great weight on the notarized travel authorization, but that document is insoluably ambiguous. Martinez points to the absence of a return date in the travel authorization as support for her version of events, but the lack of return date is equally consistent with Cahue's testimony that Martinez told him she didn't have a certain return date and might drive back to Chicago rather than fly. The note, moreover, says nothing of the duration of the stay, so it cannot be characterized as a knowing agreement to a permanent move. And despite testifying that the couple's prior "process" was to always to include a return date for the travel, Martinez did not produce any of these prior authorizations to support her argument that, in itself, the absence of such information in the July 25 letter demonstrates Cahue's knowledge that no return was planned. Finally, it is worth noting that all of the air travel for A.M. for which there is documentary evidence in the record was booked only days in advance; short-term scheduling

seems to have been the norm when it came to buying plane tickets. It is therefore unwarranted to infer much from Martinez's failure to book a return flight before leaving.

Martinez's reliance on her "custody" rights pursuant to the couple's 2010 agreement is similarly unwarranted. In her view, Cahue had already surrendered his right to object to her custody of A.M. and this fact corroborates her account of Cahue's acquiescence in moving A.M. to Mexico. But the agreement arguably cuts the other way: although he agreed not to contest Martinez's custody of A.M. in a court proceeding, Cahue preserved his right to "constant access" to A.M., including overnight visitation, and those rights would be severely compromised, if not eliminated altogether, by the child's move to Mexico. At most, the 2010 agreement shows that Cahue was content to allow Martinez to have custody of A.M. in the context of the couple's situation at that time—living in the Chicago area, where Cahue would be able to have "constant access" to A.M. The agreement falls well short of providing evidence that, three years later Cahue was indifferent to the prospect that Martinez was going to take the child with her to live permanently in Mexico.

Other evidence that Martinez herself offered also undermines the credibility of her claim to have told Cahill of her impending move. Specifically, Martinez presented the petition for child support and a protective order that she filed, but ultimately failed to pursue, in a Mexican court. The threshold question the filing of these documents presents is why, if Cahue had agreed to let her move A.M. to Mexico, she felt the need to seek a protective order barring Cahue from access to the child shortly after arriving in Mexico. Her petition in Mexico expressly alleged that Cahue telephoned and threatened to take the child from her (at ¶ 6), and in her testimony she made no attempt to square such a claim with her testimony that Cahue amicably consented to A.M.'s move to Mexico.

By contrast, the Court finds Mr. Cahue's testimony that he did not know about, nor consent to, a permanent move to Mexico to be more credible because it is corroborated by his efforts to obtain the child's immediate return—*i.e.*, the transfer of $300—and his later dealings with law enforcement, lawyers, and the State Department to investigate how to secure the child's return. That these efforts commenced soon after A.M.'s departure corroborates Cahue's testimony that he had not agreed to a permanent move. Moreover, given the nature of Cahue's involvement in A.M.'s life, and his previous dealings with Martinez regarding custody, visitation, and travel, the Court cannot credit Martinez's claim that Cahue knew of Martinez's plans and had no reaction other than being "okay" with it. But according to Martinez, he did not ask for any agreement about his continued access to his son or any plan for visitation. He did not ask a single question about where his son would live, where he would go to school, or what his life would be like in his new home. The picture Ms. Martinez paints of Mr. Cahue's indifference to A.M.'s permanent move to Mexico cannot be credibly reconciled with the reality of Mr. Cahue's efforts to remain involved in his son's life notwithstanding the on again/off again nature of his relationship with the child's mother.

Further, Martinez's contention that Cahue ratified her actions after the fact even if he did not give prior consent is not borne out by the record. Cahue's explanation of the $300 he sent on August 7 is consistent with the other money transfers to Martinez around the time of A.M.'s travel to or from Chicago. Cahue's testimony about what he did upon realizing that Martinez was not coming back is also credible and consistent with his past involvement as a father. He started by contacting her family members and local law enforcement. He then escalated to speaking to an attorney and, later, the State Department to investigate his options for compelling A.M.'s return. His testimony tracks the appearance of documentary evidence of his communications

with the State Department in December 2013 and is further consistent with Martinez's testimony that in December 2013 Cahue became insistent about seeing his son. Although Cahue's written communications with the State Department begin after Martinez filed her petition in Mexico, there is no evidence about when, if ever, he learned of that suit. (Martinez says she never served him but she told him, although she does not say when, and says she "dropped" her suit almost immediately). And, as noted above, Martinez also has never explained why she would request an order of protection in Mexico when Cahue had approved her plans.

Martinez's alternate argument regarding consent is also unpersuasive. After contending throughout these proceedings that Cahue did consent to relocating A.M. to Mexico, or at least ratify that action after the fact, Martinez argued for the first time in her post-trial response brief Cahue's consent has no bearing on the issue of habitual residence because she, the custodial parent, did not need his consent to move away with the child and could unilaterally establish a habitual residence for A.M. She contends that, as an unmarried custodial parent who was not subject to any court orders concerning the child, only she was entitled to "fix" A.M.'s residence and therefore only her intent matters. In support she cites *R.B.P. v. Lowery (In re Parentage of R.B.P.)*, 393 Ill. App. 3d 967, 971; 915 N.E.2d 434, 439 (2009). There, the appellate court held that an unmarried mother with custody who was not subject to a "custody order" or "pending parentage / custody action" was permitted to unilaterally move out of state with the child. *See id.* at 974. This was an exception to Illinois' general rule that when a custodial parent intends to remove a child from Illinois, she must request leave of court and establish that removal is in the child's best interests. *Fisher v. Waldrop*, 221 Ill. 2d 102, 117, 849 N.E.2d 334, 342 (2006). In *R.B.P.* the appellate court noted that an exception was particularly warranted in the

"hypothetical, but common situation, an unmarried custodial mother never sees or hears from the child's biological father, or even knows where he is." *R.B.P.*, 393 Ill. App. 3d at 975.

*R.B.P.* does not establish, as Martinez suggests, that here Cahue had no parental rights as to A.M.; to the extent it can be said to apply (Martinez, after all, concedes that she was party to a custody agreement of sorts), it simply means that she did not require prior leave of court to remove A.M. from the state. *R.B.P.* is, at most, a case that places the burden of action under Illinois law on the non-custodial parent; it does not eliminate that parent's rights. It would seem that, at a minimum Cahue retained the right to notice and to seek to enjoin, or overturn, the removal from Illinois. *See generally* 750 ILCS 45/13.5 (2014) (right to enjoin removal under the Parentage Act); 750 ILCS 5/609.2 (right of notice of removal);[8] *Fisher*, 221 Ill. 2d at, 117; *Hedrich v. Mack*, 2015 IL App (2d) 141126, ¶ 14, 27 N.E.3d 666, 670 (a removal may be challenged even after it occurs). Thus, this is not the situation presented in *Redmond*, where the father had no parental rights under Irish law absent a court decree, and *R.B.P.* does not support the contention that Cahue's consent is irrelevant. Martinez's removal of A.M. in July 2013 without prior leave of court may not have been wrongful under Illinois law (although *R.B.P.* says nothing of whether *notice* to other parent still is required), but that does mean that she has the sole right to change and "fix" his habitual residence over Cahue's objection.

Therefore, shared intent remains a factor in the habitual-residence determination under the circumstances of this particular case. And here, there was never a mutual intent of the parents to change A.M.'s lifelong habitual residence of Illinois. Although this factor is not dispositive by

---

[8] This is a provision of the Illinois Marriage and Dissolution of Marriage Act, and there was no marriage or divorce in this case, but under a 2004 amendment to the Illinois Parentage Act of 1984, which was in effect in 2014, the Marriage Act applies to all issues of child custody, removal, and visitation. 750 ILCS 45/4(a)(1) (2014).

itself, it weighs heavily in this case because before 2013, the parents, although separated, had a cooperative co-parenting arrangement pursuant to which A.M. lived with his mother and had frequent visitation with his father. And for the reasons noted, the Court concludes that there is insufficient credible evidence in the record to support a conclusion that the parties mutually agreed to alter this arrangement in July 2013 without a single writing or other manifestation of their mutual intent or, for that matter, the father's knowledge. The Court finds that Martinez has not met her burden of showing that she informed Cahue that she was relocating to Mexico with A.M. before she took that unilateral action, or that Cahue subsequently acquiesced in or ratified that action.

As to the other crucial factor of acclimatization, Martinez argues correctly that there is sufficient evidence to support a conclusion that A.M. became acclimatized to his new life in Mexico. He attended school, earning a high average in his second-grade class, and he played soccer for multiple teams. He was surrounded by much of Martinez's extended family and had friends and cousin to play with. Eventually the two moved into their own home. There is no credible evidence in the record that A.M. failed to adjust and indeed to thrive in Mexico.[9]

Accordingly, two of the important factors that the Court must consider point in different directions. As *Redmond* counsels, the factors that should weigh more heavily depend on the circumstances of the individual case. *See* 724 F.3d at 746. In this case, despite A.M.'s acclimation to Mexico, the scale tips in favor of the United States as the habitual residence,

---

[9] The report of the GAL touches on this issue insofar as it discusses A.M.'s purported wish to remain in Illinois and problems adjusting Mexico. However, the Court does not address this evidence, first, because (on the GAL's advice that A.M. should not testify) the respondent withdrew the Article 13 affirmative defense that A.M. objects to return to Mexico and is sufficiently mature that his opinion should be given weight, and second, because the GAL opined, credibly, that statements about A.M.'s unhappiness in Mexico were unduly influenced by A.M.'s prolonged stay with his father.

because on balance, under a flexible and common-sense approach, Illinois was still "home" to A.M. as of the relevant date of August 16, 2014.

There can be no dispute that the only home A.M. ever knew was Illinois until he was seven years old. For the most part he lived with his mother and her parents, and his father and paternal grandparents were nearby. He spoke English as his first language. He attended school and played soccer from the age of three. His parents, though never married and occasionally estranged as a couple, jointly parented him and agreed to a "custody"[10] arrangement that would maintain a large presence of his father in his life.

This long-time status quo abruptly changed in July 2013. And there is simply insufficient evidence in the record from which this Court can conclude that A.M.'s year-long sojourn in Mexico fixed his habitual residence there. The most credible narrative that the Court can discern based on all of the evidence is that Martinez decided to move to Mexico with A.M. Either she decided in May 2013 to move, as she testified, or she decided to stay with A.M. in Mexico after traveling there in July, as Cahue alternatively suggests in his post-trial brief. (The former is more plausible and consistent with other evidence in the case.) In either case, she did not inform Cahue of her plans. She and A.M. stayed with family while she got A.M. settled into his school. Cahue made efforts to secure the child's return—or at least investigated how to do so—and pressured Martinez for visitation with his son. The parties privately agreed to schedule some visits, but Cahue did not abandon his intent to bring A.M. back to Illinois for good. He obtained an application for a Hague petition from the State Department in December 2013 and maintained contact with a representative there. Ultimately, Cahue decided to use self-help rather than to

---

[10] The word is in quotation marks because there is no record evidence as to what the parties meant by "custody" in their February 2010 handwritten agreement. It might mean physical custody, legal custody, both, or something else entirely.

pursue a remedy under the Hague Convention, retaining the child after what the parents agreed (at least nominally) would be a temporary visit.[11] Martinez attempted to retrieve the child but after she was thwarted by the state court order of possession in favor of Cahue, she returned to Mexico to pursue her remedies there.

Although A.M. apparently lived the life of a typical second-grader in Mexico, there is no indication that the issue of his indefinite or permanent home was settled between his parents at any time after he left the United States. At most Cahue consented to A.M.'s "travel" to Mexico, not to his relocation there, and his actions as the length of the stay increased are not consistent with someone with the knowledge or intent that the child would live indefinitely in another country for the first time in his life. And now, on the one hand Martinez testified unequivocally (but not credibly, in the Court's view) that she shared her plans with Cahue and he never objected, and on the other, she argues that she had every right to move A.M. to Mexico without Cahue's knowledge or consent. The emphasis on this argument in Martinez's most recent filing reinforces the Court's perception that Martinez unilaterally relocated A.M. from the only home he ever had known. So too does the parties' testimony that Martinez insisted on Cahue booking a

---

[11] The Court does not endorse this approach, and recognizes that the Seventh Circuit has a suggested that a parent who fails to use the legal remedies of the Hague Convention should not obtain a legal advantage as a result of using abduction instead. *See Kijowska v. Haines*, 463 F.3d at 588-589. However, in *Kijowska*, the father wrongfully retained the baby in a country to which she had no ties (in her then-brief existence), whereas here, the self-help was retaining the child in his country of habitual residence, which is, by definition, not wrongful under the Convention. And, indeed, in *Redmond,* the Seventh Circuit confirmed that "the concepts of removal and retention can be understood only by reference to the child's habitual residence; a legal adjustment of a parent's custody rights does not give rise to an abduction claim." 724 F.3d at 741-42. The Court does not, therefore, interpret *Kijowska* to bar Cahue's defense that Illinois is the habitual residence solely based on his failure to file a Hague petition of his own (though that would have been the more prudent course of action, and surely one that would have resulted in less disruption to A.M.'s life). The Court notes as well that the State Department official who was advising Mr. Cahue suggested that he consider retaining the child in the United States. Resp. Ex. F, email of May 6, 2014 at 11:17 a.m. ("If you are worried she may not return your son to the United States again, then you should really think about letting him travel back to Mexico.").

return flight before allowing A.M. to travel; if Martinez believed that the arrangement was secure and that Cahue agreed to have only periodic visitation, she would have no reason to be suspicious of Cahue's intentions with respect to the visit in July 2014.

This is a close case, and reasonable minds could differ as to how to weigh the competing factors in this matter in resolving the factual issue of A.M.'s habitual residence. In this Court's view, however, the lack of shared parental intent in this case outweighs A.M.'s apparent acclimatization in Mexico for the relatively brief time he was there. The Court cannot conclude that his acclimatization there eclipsed his lifelong connections to Illinois in a single year, during which his parents were continuing to negotiate a resolution (and also to separately investigate legal remedies). Moreover, although it is clear that an abductor is not to benefit from "running out the clock" on a wrongful retention until the child becomes accustomed to a new home, *Garcia*, 808 F.3d at 1169, here Cahue "retained" A.M. in his country of birth and where he spent his formative years, and A.M. now has been back in the United States for longer than he ever lived in Mexico. As a practical matter, then, only one-tenth[12] of A.M.'s life was spent in Mexico. And he was not a baby when he left the United States; he was a young child capable of forming significant ties and who undisputedly had done so. His habitual residence is not necessarily his mother's. *See Kijowska*, 463 F.3d at 588 (noting that even an infant's residence is not automatically that of the mother). Rather, it is where the child himself should be considered "at home." Under the common-sense, flexible approach mandated by the Seventh Circuit, Illinois, not Mexico, remained "home" for A.M. through August 2014, when his father failed to return him to his mother.

---

[12] A.M.'s birthday is withheld for privacy reasons, but he will be ten years old soon.

D.     **Conclusion**

Given that there is insufficient evidence that Mexico ever became A.M.'s habitual residence, the retention of A.M. in Illinois in August 2014 was not a wrongful retention within the meaning of Article 3 of the Hague Convention. The "'retention of a child in the state of its habitual residence is not wrongful under the Convention." *Redmond*, 724 F.3d at 742 (quoting *Barzilay v. Barzilay*, 600 F.3d 912, 916 (8th Cir. 2010)). And without a wrongful retention, this Court has no authority to order the child to be returned to Mexico. *See id.* ("If a child has not been moved from its habitual residence . . . relief under the Hague Convention must be denied without further inquiry into whether the petitioning parent's custody rights have been breached or whether the petitioning parent was actually exercising those rights at the relevant time.").

Because it has been determined that Illinois is the place of habitual residence, there is no need to rule on the respondent's affirmative defenses: (1) the petition is untimely and the child is now well-settled in Illinois;[13] and (2) that Martinez acquiesced to the wrongful retention through her participation in the state court proceeding Cahue initiated in August 2014. [14] For that reason,

---

[13] Martinez concedes that her petition was untimely and that, therefore, the well-settled defense was available to the respondent. This concession might have been improvident. Under Article 12 of the Convention, the relevant time period is between "the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is" and "the date of the wrongful removal or retention." In this case the alleged wrongful retention occurred in August 2014. The Hague petition that Martinez initially filed in Mexico was transmitted to the State Department—here, the "administrative authority of the Contracting State where the child is"—on March 13, 2015. Neither party has shown the Court any authority to support their mutual belief that, in contravention of the plain language of the statute, only the filing of judicial proceedings, not administrative, tolls the statute of limitations. Plainly, the State Department does not share that view, as its letter to the Cook County Circuit Court in March 2015 took the position that Martinez's Hague Convention petition precluded the Circuit Court from further addressing Cahue's custody petition. This question of statutory interpretation may be left for another day, however, because the petitioner did not establish her *prima facie* case of wrongful retention.

[14] A third affirmative defense—that A.M. objects to the return and is of sufficient maturity that his opinion should be taken into account, *see* Article 13—was withdrawn in

the Court has not discussed the report of the GAL, whom the parties called upon primarily to assess the affirmative defenses.[15]

\* \* \*

As previously ordered, the petition for return of the child is denied. The temporary restraining order is terminated, and all travel documents shall be returned to the respondent forthwith. The parties are left to adjudicate any issues of custody, visitation, and support in the Illinois courts.

Date: March 18, 2016

John J. Tharp, Jr.
United States District Judge

---

response the opinion of the GAL that A.M. was not sufficiently mature and that it was not in his best interests to be required to give testimony in these proceedings. To their mutual credit, neither of the parents contested that conclusion or tried to compel A.M. to testify or otherwise participate in this proceeding.

[15] The Court extends its appreciation to the GAL, Rebekah Rashidforokhi, Director of the Guardian ad Litem Program at the Chicago Volunteer Legal Services Foundation, for her participation in these proceedings and the thorough and helpful report she prepared on an expedited basis.